UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. MANHUA MANDY LIN | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | CIVIL ACTION NO.  02-CV-3612 |
| | : | |
| ROHM AND HAAS COMPANY | : | |
| | : | |
| Defendant | : | |

**AFFIDAVIT OF DR. MANHUA MANDY LIN**

I, Dr. Manhua Mandy Lin, depose and state as follows:

1. I am the Plaintiff in this matter and I am personally familiar with the facts and circumstances giving rise to this claim, the claims made against me by Rohm and Haas in the Court of Common Pleas of Montgomery County (the "Injunction Action") and the various documents and evidence that has been developed in both cases.

2. I terminated my employment relationship with Rohm and Haas as part of a negotiated settlement of my discrimination claim against Rohm and Haas. The terms of the settlement are set forth in an EEOC Settlement Agreement (Defendant's Exhibit A-2) and an Agreement and Release (Defendant's Exhibit A-3). The Agreement and Release was ancillary to the EEOC Settlement Agreement and was intended to provide further details of my claims against Rohm and Haas, provide for a "one year non-compete in acrylic acid" and set forth Rohm and Haas' expectations concerning confidentiality. (Defendant's Exhibit A-2, Para. 7.C.).

3. When I terminated my employment with Rohm and Haas, one of my primary concerns was my ability to get another job to continue my scientific career path. I knew that as a research scientist, the most important thing I could do to facilitate getting a new position was to maintain a high professional profile by writing and publishing papers in scientific journals and delivering presentations at various scientific meetings.

4. My work at Rohm and Haas related to the investigation and analysis of the manner and methods for creating a catalyst to convert propane to acrylic acid. In the course of my employment, I made a number of discoveries that advanced the known science in that area. Some of my discoveries were either the subject of patent applications or were intended to be the subject of future patent applications. Although the patents

were for my inventions, I always knew and agreed that my obligation was to assign my patent rights to Rohm and Haas when a proper patent application was filed with the U.S. Patent Office.

5.     I am and always have been acutely aware of my obligations as a Rohm and Haas employee or former employee to maintain Rohm and Haas trade secrets in strict confidence. In fact, it has always been in my best interest to protect the confidentiality of Rohm and Haas trade secrets because if trade secret information concerning one of my inventions is publicly disclosed before the information has patent protection, I would lose the ability to have my invention patented together with the related credit for that patent.

6.     As part of the negotiations for the settlement of my discrimination claim, I wanted to be able to publish papers relating to the important work I did while employed at Rohm and Haas. In exchange for my release of all discrimination charges, Rohm and Haas agreed that I would be permitted to write and publish papers on that work so long as the papers did not disclose Rohm and Haas trade secrets. I had no reservation about agreeing to that limitation. The EEOC Settlement Agreement records that agreement in Paragraph 7.I.

7.     We had a long discussion about the process for protecting my rights along with Rohm and Haas' legitimate interest in protecting its trade secrets. I would not agree that Rohm and Haas could unilaterally decide what constituted a trade secret. I did not trust Rohm and Haas to act fairly toward me and, since this was such an important part of my post-employment interest, I could not be in a position where Rohm and Haas had the right to foreclose my right to publish entirely by simply labeling everything a "trade secret."

8.     The compromise we agreed to was that after I wrote a paper based on my research at Rohm and Haas, but before it was submitted for publication, I would submit the paper to Rohm and Haas for trade secret review. If Rohm and Haas raised legitimate trade secret concerns about its content, we would work together to find a way to make the paper publishable. Rohm and Haas initially wanted the absolute right to determine what was a trade secret but I would not agree to that. We therefore provided only that Rohm and Haas would have the right to do a "review." We specifically deleted any language that suggested that Rohm and Haas had a right of final approval over the contents of my papers. Attached hereto as Exhibit MM is Rohm and Haas' proposed first draft of the Agreement and Release. Paragraph C.5.h. of that draft provides that "Any disputes which can not be resolved will be decided in the sole discretion of Dr. Charles Tatum." The second draft of the Agreement and Release is attached hereto as Exhibit NN and contains identical language. That language was deleted from the final version of the Agreement and Release. (Defendant's Exhibit A-3). The agreement in its final form was satisfactory to Rohm and Haas because the right to perform a trade secret review gave it the opportunity to take whatever steps it believed was necessary to protect its interests if it truly felt that my proposed publication contained trade secret material and I disagreed. Conversely, I had the comfort of knowing that Rohm and Haas did not have the unilateral

right to stop me from publishing non-trade secret material based on my work at Rohm and Haas.

9. The papers I intended to write were of a highly technical nature relating to scientific research. Papers of this nature typically have four essential components: experiments, results, discussions, and conclusion. In any research paper, the actual experimental procedures and results are the foundation upon which the discussion and conclusions are grounded. There is no way to even begin to formulate a framework for such a paper without access to the underlying data. One must have the opportunity to review, analyze, weigh, compare and evaluate data. I was well aware that the standard form agreement for departing employees with Rohm and Haas could have prevented me from taking data with me when I left my employment. Nevertheless, I could not write papers as contemplated by my settlement agreements without the ability to reference the data and other documents. We talked about whether I would be able to have access to Rohm and Haas data after I left. Rohm and Haas agreed with me and told me that the right to take and use data for the purpose of writing a paper was inherent in the right to write such papers.

10. The data I would retain for the purpose of writing papers, to the extent that it was confidential, would to remain confidential. I never suggested that my obligation to maintain the confidentiality of trade secrets was waived by the agreement that I could retain data. Both parties agreed that the same confidentiality obligations that were imposed on all employees departing from Rohm and Haas would remain in effect for me other than the fact that I would have access to data after I left Rohm and Haas to fulfill the agreement that permitted me to write papers based on my work at Rohm and Haas.

11. All of these discussions are reflected in the terms of the final version of the Agreement and Release (Defendant's Exhibit A-3). I was given the right to publish subject to Rohm and Haas' right to conduct a trade secret review. (Defendant's Exhibit A-3, Para. C.5.h.) There was no language in the Agreement and Release that provided Rohm and Haas with a right of approval over my proposed publications. We agreed that I would remain subject to the same confidentiality provisions as all former Rohm and Haas employees. (Defendant's Exhibit A-3, Exhibits A and B) However, I was concerned that the language of the Worldwide Confidentiality and Employment Agreement (Defendant's Exhibit A-3, Exhibit A) and the Departing Employee Notice and Acknowledgment of Continuing Obligations (Defendant's Exhibit A-3, Exhibit B) that provided that I had to return all Rohm and Haas data and documents upon the termination of my employment could be read to preclude my right to retain and use Rohm and Haas data and documents for the purpose of writing papers.

12. Rohm and Haas explained to me that the clause in the Agreement and Release giving me the right to write papers was sufficient to incorporate and protect my right of access to the data that I needed. I insisted that there be some additional language to clarify my rights. In the final version of the Agreement and Release we inserted language that provided that the Agreement and Release would control where there was a conflict with the provisions of Exhibits A and B. (Compare, Exhibit NN, Para. E.13 and

Defendant's Exhibit A-3, Para. E.13.) The <u>only</u> reason why this language was inserted into the Agreement and Release was to affirm and clarify that my inherent right to retain Rohm and Haas data for the purpose of writing papers took precedence over the standard requirement that departing employees return all documents and data upon their separation from employment.

13. At the time the Agreement and Release was drafted, I prepared a list of twelve (12) research papers and the corresponding subject areas for proposed future publications. These were the papers that were the subject of my "right to publish" referenced in the Agreement and Release. Prior to leaving Rohm and Haas, I met with Dr. Han to discuss these possible topics for papers that I intended to write. (Exhibit OO). Dr. Han has always agreed, and so testified, that for the purpose of "fulfilling the terms of the contract," the data necessary to write these papers would be made available to me. (Exhibit PP, N.T. Han, July 14, 2000, pp. 52, 56-62)

14. In December, 1999, after I left Rohm and Haas, I was asked to review and verify the contents of a patent application for one of my inventions (DN 99-040). Rohm and Haas knew that I had to have retained data in my possession to conduct that review. In fact, Rohm and Haas paid me over $3000 to conduct that review. I submitted a scientific paper for publication in January, 2000 relating to a presentation I had made in Rimini, Italy the year before. Rohm and Haas was aware that the paper could not have been written without access to the underlying data. In February, 2000, I submitted another paper for trade secret review that once again could not have been written without access to Rohm and Haas data. In March, 2000, I prepared and presented a presentation to the American Chemical Society. The presentation could not have been prepared without access to Rohm and Haas data. Rohm and Haas was acutely aware of each of these events and never suggested that I was not authorized to have Rohm and Haas data nor did Rohm and Haas request that I return the data.

15. All of these efforts were directly linked to my planned effort to maintain a high profile in the scientific community for the purpose of obtaining employment as a research scientist in my field. I always intended to write all of the papers and make presentations on the subjects identified in my "Inventory List of Publication Areas" (Exhibit OO) for that purpose. Each of the papers and presentations prepared using Rohm and Haas data was to be first submitted to Rohm and Haas for trade secret review pursuant to my obligations under the Agreement and Release.

16. In April 2000, I also started a full time job search utilizing the services of the Manchester Agency. This outplacement source was provided to me by Rohm and Haas under the terms of the Agreement and Release.

17. In June, 2000, more than two months after my ACS presentation, Rohm and Haas instituted its retaliatory "Injunction Action" against me in the Court of Common Pleas of Montgomery County. The litigation took me by complete surprise. I had never been involved in litigation before and was devastated to find that Rohm and Haas pursued me using totally fabricated evidence and knowingly false and inflammatory

arguments. Rohm and Haas completely denied, and Rohm and Haas witnesses swore that they had never heard of or been involved in, the very course of conduct that we had been engaged in since the termination of my employment. The initial casualty as a direct result of litigation was my job search which I was forced to suspend on June 14, 2000. (Exhibit UU) The injunction proceedings dragged out over months and months. My legal expenses consumed all of my financial resources and I had to go into debt to try to protect my name and reputation. As a result of the litigation, I could not eat, sleep or take care of my family. I became deeply depressed to the point of being essentially non-functional. As a direct result of the litigation, I was forced to obtain professional mental health care. (Exhibit BB) For almost two years, whatever energy I had was invested in the litigation rather than in seeking employment. I also could not pursue employment knowing that Rohm and Haas was letting it be known to third parties that I had disclosed trade secrets. (Exhibit AA).

18. At the conclusion of the Preliminary Injunction proceedings, my "benefit" from the Agreement and Release that allowed me to publish based on Rohm and Haas data subject only to trade secret review had been totally reversed and became the basis for Rohm and Haas to relentlessly frustrate any effort that I might attempt to secure future employment. Before the Injunction Action, I had the acknowledged right to access data for the purpose of preparing scientific papers. The Order granting the Preliminary Injunction required me to return all data and documents in my possession to Rohm and Haas. Before the Injunction Action, I had a contractual right to publish limited only by a "trade secret review." The Order granting a Preliminary Injunction, at the insistence of Rohm and Haas, provided that I could no longer "use" any information that "Rohm and Haas considered confidential or trade secret." I was enjoined from making _any_ scientific presentation or publication unless, after a 90-day "trade secret review" Rohm and Haas agreed that the presentation or publication contained no Rohm and Haas trade secrets. (Defendant's Exhibit F)

19. It was always agreed that after I left Rohm and Haas, I had the right to obtain another job as a research chemist. The Agreement and Release specifically provides that Rohm and Haas would provide outplacement services for me to assist in that effort. The only restriction that we agreed to was that I would "not work in any capacity performing work on catalysts in relation to acrylic acid" for a period of one year. (Defendant's Exhibit A-3, Para. E.12.)

20. After I left Rohm and Haas, I thought my chances of obtaining employment would be increased if it appeared that I was still employed in the field. I was also exploring self-employment opportunities. I created a Pennsylvania limited liability company called EverNu Technology, LLC on June 2, 2000, three (3) days before the Injunction Action was served on me. When the Injunction Action was served I was forced to abandon all activities on behalf of EverNu. EverNu became a shell that carried on no activity other than giving me the opportunity to list a current "employer" on my resume. (My resume is incorporated into Exhibit 1 of Defendant's Motion for Reconsideration).

21. In 2002, I felt that I had to be gainfully employed again or I would never be able to get back into the field. On behalf of EverNu, a grant application was submitted to the U.S. Department of Energy in response to a solicitation from the D.O.E. "Small Business Innovation Research Program." The guidelines for the program required that any proposed project be limited to original research. The EverNu grant application sought funding for an original research project relating to "Metal Oxide Catalyst for Methacrylic Acid Preparation via One-Step Oxidation of Isobutane." The research has nothing to do with anything I worked on while at Rohm and Haas and, by its title, clearly has nothing to do with "work on catalysts in relation to acrylic acid." (Exhibit PP, Abstract of D.O.E. grant to EverNu) Moreover, the grant application was not filed until more than two (2) years after I left my employment with Rohm and Haas.

22. EverNu was awarded a grant of $100,000 to conduct the proposed research. The research is being conducted in collaboration with chemists associated with Temple University because EverNu has no facilities to conduct the research on its own. As part of the grant proposal, and so that I could get access to Temple facilities, I was able to obtain an unpaid temporary appointment as an Adjunct Associate Professor in Temple's Department of Chemistry. The research for this project is the confidential, proprietary intellectual property of EverNu Technology and subject to confidentiality agreements with the D.O.E. and Temple University.

23. The D.O.E. publishes abstracts of the various grants awarded under its Small Business Innovation Research Program. Apparently, in March, 2003, Rohm and Haas saw the abstract published on the Internet. Ever since that time, Rohm and Haas has been seeking access to the confidential technology, along with any and all other documents and data concerning EverNu Technology. Based on the argument of its entitlement under the Preliminary Injunction Order, the Court of Common Pleas of Montgomery County granted a Motion to Compel requiring Dr. Lin to turn over all documents relating to <u>EverNu's</u> grant application, communications between EverNu and its collaborating scientists and all documents resulting from its research. Further, Rohm and Haas has served EverNu with a subpoena seeking all of EverNu's corporate documents, all documents reflecting technical information generated by me and all communications between EverNu and its collaborating scientists. (Exhibit RR) The production of these documents has been stayed pending a hearing on EverNu's Motions for Protective Order and Motion to Quash Subpoena.

24. In pursuing the technical documents belonging to my subsequent employer, Rohm and Haas no longer relies on its rights under the Agreement and Release but claims a right of access to any technical information generated by me under the guise of checking to see if I am "using" information and data that Rohm and Haas deems confidential.

25. Rohm and Haas' claimed right of access to my scientific work extends far beyond anything contemplated by the Agreement and Release. The information sought by Rohm and Haas is not limited to a review of a scientific paper drafted by me or a proposed scientific presentation prepared by me using Rohm and Haas data. The Order

granting the Preliminary Injunction is being used to justify a claimed right to see and have access to any and all technical and non-technical information pertaining to my subsequent employment. (Exhibit VV)

26.     If Rohm and Haas has the right of access, or even the claimed right of access, to any and all technical data generated by or used by me in subsequent employment, no employer will consider hiring me as all of their confidential and proprietary intellectual property will be at risk of disclosure.

27.     It was always the intent of the parties that Rohm and Haas' trade secret review was limited to proposed publications based on Rohm and Haas data. The Preliminary Injunction Order now requires that Rohm and Haas be given prior access to and a right of approval over <u>any</u> scientific paper that I might write. The Order, as interpreted by Rohm and Haas, and as Rohm and Haas is specifically seeking to enforce, provides Rohm and Haas with the right to review and censure any scientific paper that I might write, whether the paper deals with any subject on which I worked while at Rohm and Haas or not. No potential employer will consider hiring me if, before I make a scientific presentation or publication pertaining to work I do for that employer, I have to seek and obtain Rohm and Haas' approval first. That process, which Rohm and Haas is insisting on, would require a subsequent employer to disclose its own confidential and proprietary information to Rohm and Haas before a paper could be submitted for publication.

28.     Prior to the Preliminary Injunction Order, trade secret reviews could normally be accomplished in a few hours or days at most. For example, on February 29, 2000, I submitted a twenty-two (22) page review article to Dr. Han for his trade secret review. I had lunch with Dr. Han on March 6, 2000. Dr. Han had completed his review and had specific comments and concerns that he related to me. I revised the paper as per his suggestions and returned the paper to him for further review on March 7, 2000. By March 10, 2000, Dr. Han had completed his second review, sent the paper to Dr. Richard Piccolini for additional comments and Dr. Piccolini had made substantial edits and returned the paper to me for finalizing. Further, in preparation for my presentation to the American Chemical Society, meeting of March 28. 2000, I submitted an outline of the proposed presentation on March 21, 2000. Dr. Han conducted a complete trade secret review of my proposed presentation in a matter of a few hours. He was able to confirm that the presentation contained no trade secrets and authorized me to give the presentation on the sole condition that I remove the "new [published] patent material." (Defendant's Exhibit A-4, Letter of M. McLaughlin, Esq., March 28, 2000). There was never a suggestion that Dr. Han lacked sufficient time to conduct the trade secret review.

29.     The Preliminary Injunction Order provides Rohm and Haas with a 90-day period within which to conduct a trade secret review. Rohm and Haas has consistently used all of the 90-day period permitted by the Preliminary Injunction Order to conduct its review of my proposed presentations. Many times, scientists are invited to give presentations or papers less than 90 days before an outline or abstract is due. These invitations provide an opportunity to publicize one's work and are an important part of

maintaining or enhancing one's standing in the scientific community. Rohm and Haas' insistence on using the full 90-day review period effectively denies me the ability to take advantage of these opportunities. For example, on June 16, 2003, I was invited to submit a paper to a prestigious scientific journal. The invitation required that I prepare and submit a manuscript no later than September 5, 2003. I immediately wrote to Rohm and Haas and requested an assurance that it would attempt to conduct a trade secret review on an accelerated basis so that I could comply with the limited time requirements. Obviously, if Rohm and Haas insisted on taking the full 90 days to conduct a trade secret review, there would be no need for me to write the manuscript. Rohm and Haas simply never replied to my request and I was therefore unable to participate in this event. (Exhibit SS, Correspondence of M. Lin, June 18, 2003 with attachment; Exhibit TT, Excerpt of Deposition of J. Vouros, Esq. p. 162)

30.     Since 2002, Rohm and Haas has insisted that it has no obligation to provide me with access to any other data. The data and documents I retained when I left Rohm and Haas only related to the first three proposed topics listed in my Inventory List of Publications, I have been completely foreclosed from the opportunity to write any of the additional papers based on my work while employed at Rohm and Haas to which Rohm and Haas originally agreed. (Defendant's Exhibits A-65, 66; Exhibit LL).

31.     I am personally familiar with the foregoing facts and the same are true to the best of my knowledge, information and belief. Further, the exhibits attached to this Affidavit are true and correct copies of documents that have been identified and authenticated in proceedings either in this Court or in the Injunction Action.

32.     I certify under penalty of perjury that foregoing is true and correct to the best of my knowledge, information and belief.


                                                                              _____
                                                                              DR. MANHUA MANDY LIN
Date: <u>December 9th, 2003</u>